The court will now call Appeal 22-2454, Isabelle Arana v. Board of Regents of the University of Wisconsin. We'll begin with argument from the appellant, Ms. Bronson. Thank you, Your Honor. It may please the court. I'm Alexandra Brodsky for Appellant Isabelle Arana. Title IX's text is on Isabelle's side. Consider the sole element on which the district court ruled against her, the required educational deprivation. The University argues this case shouldn't go to a jury because every Title IX plaintiff needs to show her grades got worse and Isabelle's didn't. But the plain language of the statute forecloses that meaning. It forbids students from being excluded from participation in or denied the benefits of the school. Because a jury could find Isabelle experienced those kinds of educational injuries, even if her grades remain strong, the University is not entitled to summary judgment on this element. Ms. Brodsky, may I start you off, please? Could you please discuss how one severe instance of sexual assault off campus could lead to a university's liability under Title IX, even if no further acts of harassment take place after the university learns of the assault? Absolutely, Your Honor. And I promise I'll answer the question directly. What I'll say first is that the university has forfeited the argument about the off-campus location of the harassment. And I don't think this court needs to reach the question. Let's assume they didn't for the purpose of the question. Sure. I also don't think that this court needs to reach the question about a single incident because this isn't a single incident case. But to address these three issues and to get in reverse order. So we know from Davis, Gebser, Jackson, that deliberate indifference to sexual harassment is itself intentional sex discrimination. So if a school's deliberate indifference to sexual harassment causes a student to be excluded from participation in or denied the benefits of the school, that's a Title IX claim. And we know from cases like this one, like Waymer, like Fairfax, like Farmer, that a student can experience one of those kinds of educational deprivations without additional harassment. Because the school's deliberate indifference, and I think Waymer puts this particularly eloquently, can put a student in the terrible bind of having to choose between their education and their safety. And in that circumstance, many victims will choose to sacrifice their education in order to remain safe. And the university would have the school instead treat Title IX like a sexual harassment tort, in which the only quote relevant harm is additional sexual harassment. But the plain language of the statute forecloses that reading as well. On the question of whether a single assault can be enough, I think that the First Circuit in Fitzgerald, the Fourth Circuit in Fairfax are correct that a single assault, combined especially with the exacerbating effects of the school's deliberate indifference, can have the requisite effect. But again, and I think that Isabel's case shows as much, you can see how the rape pervaded her whole experience at the school. But this isn't a single incident case. There were multiple rapes on the night in question. Seif has also recruited his roomie to take photographs of Isabel and the other victim in a vulnerable state between the rapes. There's then a post-assault hostile environment because of Seif's presence, which he then exacerbates by his first available opportunity, the first time he sees her after the rapes, making a beeline for her such that her lawyer has to step in front of Isabel in order to prevent physical contact. If the university had responded to this incident in the first instance by suspending Seif for five months and imposing a no contact form, would that have been deliberately indifferent? And what was the most analogous case that you can point us to that would reach the result for which you're arguing over that question? So I think that the answer is that that would be a more reasonable response. So if we're looking at a spectrum of clearly unreasonable to clearly reasonable, it moves us toward reasonable. I do think it would turn on what the school, whether they provided additional safety measures on top of the no contact order, once Seif S violated it, because I think that a no contact order might be a reasonable place for a school to start. And this case is not a referendum on whether no contact orders are. Did you already concede this point? Did you already concede this point that the university was not deliberately indifferent in its original response? Oh, yes, Your Honor. So I agree that if the school had not reinstated Seif, that there would not be a deliberate indifference case here. I took your question to be if instead of expelling Seif, the school had suspended him. Could that have been enough? And if those position is not and could not be that the school had to expel Seif. I think that Davis is clear about that. But there are fact and case specific questions about whether the no contact order here was enough. And just to run through some of those. There's the fact that Seif had violated it. It's the fact that he had violated it as first available opportunity. Can I just ask about that? I mean, he was required to be at that disciplinary. Right. So that was sort of he had to be there. That's right. And I think if the issue was just that they were in a room together, which could, in other circumstances, be a violation of a no contact order, I don't think that that would do anything for Isabel here. But there's a dispute of fact about what happened. Isabel's testimony and the witness's testimony is that Seif makes a beeline for her, is about to make physical contact with her. Didn't it all occur before he was expelled? Wasn't that just part of the stuff that you just conceded that was not deliberate indifference? I thought that hearing occurred before he was reinstated. It did, Your Honor. If Seif had remained expelled, then his presence wouldn't pose a continued threat to her that required more than a no contact order. Just to run through a couple other factors, I think what a jury could look at to think that more than a no contact order was required here. There's the fact that Seif had an extensive disciplinary history from before these rapes, which included previous allegations of sexual harassment. The no contact order, just so we're clear, was entirely a fact. They never even saw each other after he was reinstated, right? I think the jury could disagree, Your Honor. A jury could agree. Are there facts in the record that suggest that they saw each other after the no contact order was reinstated? I mean, he was reinstated. How could a jury conclude that based on no facts? Your Honor, I agree that a jury could easily find that they didn't see each other again other than this time before the hearing. How could they find that they did? Your Honor, I don't know that they could, but I think the distinction is that that doesn't mean that no contact order was effective. So we have the one instance when they see each other when it's not effective. And then a jury could find, as the panel majority held, that a jury could find that the reason they didn't see each other was that Isabel was hiding in her dorm. She took steps to protect herself, and that's why she didn't see him again. Do you realize the breadth of your argument that Isabel was subjected to hostile environment after the assaults due to Seif's continued presence on campus? The breadth of that argument is that the University of Wisconsin, in order to provide liability under your theory, had to expel her. Including the fourth grader has to be kicked out of class for bullying, has to be kicked out of school, and the high school or the middle school, and on and on and on. I disagree, Your Honor, because Davis is clear that schools don't actually have to fully ameliorate a hostile environment. We live in a situation where you acknowledge there are no facts that they even saw each other after he was reinstated. Not zero. They didn't see each other. And yet your argument is that just his presence on the University of Wisconsin campus, one of the biggest campuses in America, created a hostile work environment for him. Imagine a fourth grader. So, Your Honor, I think it would be banished from the town under your theory. I disagree, Your Honor, again, because the school doesn't actually have to fully ameliorate the hostile environment. The question is just whether their response to that hostile environment is fairly unreasonable. Maybe it'd be helpful to flip to the other side of the question. We have outlined for, at least what we've heard this morning, the deliberate indifference as far as what happened before. And so I guess the other side of that question would be, what is the best argument for why the university's response was clearly unreasonable? What would be the response to that question? Yes, Your Honor. So I think a jury could, wouldn't have to, but could look at this record as a whole and determine that the university believed that Cephas had raped her, had arranged for photographs of her, had created a hostile environment for her, its own finding based on its knowledge. I want to start, though, with the timing of the readmission. Yes, Your Honor. So if we start there, that would be helpful. Absolutely. So the school, with that knowledge, nonetheless decides to reverse its finding, reverse its remedy because of these external pressures from donors and fans. And without putting in place additional measures, fully knowing, based on its previous findings, exactly the effect that Cephas' readmission would have on Isabel. Are you suggesting that they should not have considered at all the jury as well? You said based on, I thought Judge Pryor tried to move you ahead and then you went back and said, well, based on those facts, based on the knowledge that Cephas had raped her. But I think the jury had concluded that he hadn't. And the university is going to get sued here by someone, right? Cephas, we were by Iraq. So what could the university have done to answer Judge Pryor's question, based on what they knew at the time he was reinstated? Sure. So I think there are two questions in there, which is what is the relevance of the school's previous findings to what it does with the reinstatement? And then what is the relevance of the jury acquittal? So to take each of those, our theory here is that the school, in fact, not that the school was legally compelled to believe Isabel, but that it did believe Isabel and nonetheless read Cephas without providing the additional safety measures that would allow her to have equal access to education. And that's where the school's, the consideration of the school's reasoning comes in. It's not that the school is liable because it got the answer wrong. It's that one piece of the puzzle is that after this readmission, because of the external pressure, it offers a post hoc justification for its actions to try to obscure its true motives. And so are you suggesting that the rationale to readmit had to be pretextual because of how the university had responded initially? I don't think it had to be pretextual. It's possible that new evidence would have come out at trial that genuinely convinced the school and it would have been properly readmitted Cephas. But I do think that there is evidence that the school did not, in fact, change its mind. Does the rationale really matter if she's still protected after this reading? Yes, Your Honor, for two reasons. One is that we don't think that she was adequately protected afterwards. Assume she was. Assume they had given her all of the protection she had asked for. They gave her a private security guard and everything else she wanted. Would the rationale matter then as to why they raised it? I think the rationale would be relevant, but it might not be enough to go over the line to a clearly unreasonable response. I think it is more unreasonable to expel a student based on university findings and then readmit it and determining that that expulsion is the appropriate remedy and then readmit him because the guy whose name is on the football facilities wants him to. Then it would be to determine in the first instance that a two month, five month suspension might be enough. But the school then doesn't provide, doesn't then provide her sufficient safety measures after the fact. And just to go to your question about pretext, Your Honor, I think there are a number of facts that a jury can look at to determine that the post hoc justification here was pretextual. Part of it is that the university can't articulate it until a post deposition declaration. There's the fact that the process itself was brushed and one sided in stark contrast to all of the university's previous proceedings in this investigation. There's the fact that justification just doesn't really hold water, or at least a jury can find that. And you put all of these pieces together, along with the fact that the VP in charge of the public relations response regarding CFIS is directly consulting on this decision to the exclusion of the Title IX coordinator. You put all of that together, and a jury could say, you know, I don't think you were really trying to find the truth. I think if you were trying to find the truth, you would have brought in Rockefeller and her and her lawyer rather than doing this one side quick reversal. I'd like to just say something about the university's reliance on its own regulations that it says didn't require it to include as well. So, I guess two points the matter of law. Obviously, if there's a conflict between federal law and a school regulation, federal law would trump. I also don't think it would be a defense for a school to say, well, sure, we acted fairly unreasonably, but only because our policy required us to. But you've argued it was bad faith to do that. And how can you say it's bad faith if you're relying on state court or state policy? So, these were regulations that were not a sexual harassment policy. They were instead generally applicable procedures for non-academic student discipline, a lot of which doesn't involve a student counterparty. So, these would apply if, let's say, a student damaged university property. That's a dispute between the student and the university. And you see that reflected in how these regulations are designed. That by the university's own telling, and this is in document 165, these were really focused on the due process rights for the accused. And also according to the university, they gave the chancellor unfettered discretion in how to consider a petition for readmission. And so, what that means is that any Title IX responsibilities of the school were not built into those regulations. They were instead going to have to layer on. And just to give you one other example from those state regulations, they also allow for the school and the respondent student to delay a hearing for as long as they agree to. That could make sense if we're talking about destruction of university property where there's no one else to complain about that delay. But if here, the university had gone to see this and say, hey, let's delay the hearing by three years so that you can be recruited by the NFL, is that we have a lot to complain about that. I think that that would be clearly unreasonable. And the fact that it was technically permitted by the regulations in the same way that her exclusion from the petition was technically permitted wouldn't be a defense there. Ms. Brodsky, can I point, rewinding a bit and going back to Judge Kirsch's question with regard to the petitioner concerns after the no contact order was in place and CFS was readmitted. I think Judge Kirsch raises a good question with regard to what a limiting principle might be. So here, let's say hypothetically, a person who was a victim of sexual assault goes through this process, gets into contact order, and then just, and the person already, and the alleged attacker leaves campus. But the person, but the complainant still feels very threatened because the possibility that he might come back and doesn't go to class. Right. So just subjective fear. I think one of the questions is, is that enough? Just to establish deliberate indifference, that is, the fact that the complainant has subjective fear. Okay. And if it's not, then what is a limiting principle? Because I think the facts would be different and you'd have a stronger argument if, say, after CFS is admitted, they again are enrolled in the same class. Okay. And then, and then Irana comes and says, you know what, we're in the same class. I feel really threatened. He sits right next to me or he comes by lab partner. And can you do something? And the university is like, no, you know, there's no incidence of harassment. So you're good. I think we would say that those facts are different from a simple case, from another case, from the extreme that I gave you where the alleged attacker leaves campus and the student just stays in a room because she's subjectively fearful. So what is that rule that you want us to articulate distinguishing those two? Sure. So I think one limiting principle is I do think that the experience of the hostile environment has to be objectively reasonable and that a jury, this court does not need to decide whether Isabel actually experienced objectively a hostile environment. That's a question for a jury. And I think some facts that a jury could look at here are one, the fact that the university. But then everybody gets to a jury. Everybody always gets to a jury. Your Honor, I don't think that that's right, because. Well, why not? You just said it. The jury should consider. There are multiple elements to a Title IX claim. Just to put this in a little bit of historical context, when the panel ruled for Isabel last summer, that was the first time this court had ruled for a Title IX sexual harassment plaintiff in 27 years. It was the first time it had ever done so under the Davis standard. So I think that we see that Davis enough without any of the additional rules that the university asks to later on is enough. And here I think a jury could find. A trial judge can decide that on summary judgment, right? Whether or not there are sufficient facts on which a reasonable jury could decide whether or not the victim's fear was objectively reasonable. That's correct, Your Honor. And I think that here there are two. So you're saying in some cases where there aren't any facts to support that, that wouldn't go to a jury, right? That would be dismissed on summary judgment. That's correct, Your Honor. But here there are facts, including the fact that the university itself, administrators who understood the geography of the school, its size, how students use communal spaces, they found repeatedly during their initial investigation and hearing process, that CFS's presence created a hostile environment. Move ahead to the reinstatement. You want to mix apples and oranges. You keep going back and say. I take your point. Move forward. Move forward. I take your point, Ms. Brodsky, that those facts did not change. That's correct, Your Honor. So it's relevant to the university's calculation or evaluation of this question at the time of readmission when Ms. Arana presents her concerns to the university. Can you flesh that out, please? That's correct, Your Honor. So we imagine this. Let's go to you. So I agree that the school's deliberate indifference starts with its reactions to the reinstatement, but what happens before then speaks to what the university found happened. And in some instances to what a jury can find out, you know, if we're concerned that it's just Isabel subjective experience of a hostile environment, the fact that the university had previously found that to be reasonable. Is one fact that a jury could look to to say that's right. And I want to reserve the rest of my time. There's just one more quick thing I wanted to say on deliberate indifference, which is that the university says that in order to be deliberately indifferent regarding not providing more than the no contact order after CFS's violation of it, the university says that it had to actually know he was going to violate the no contact order again. And in getting there, it's quoting from the wrong part of CS. CS talks about two ways in which knowledge comes into a title IX claim. One is, is there actual knowledge of sexual harassment? For that, knowledge of risk is not enough. The school needs to have knowledge of harassment that has already occurred. Then knowledge, knowledge also comes into the deliberate indifference analysis, and their risk is relevant because the question is, was the school's response reasonably calculated to address that risk? In its supplemental brief and saying it needs to know that CFS was actually going to violate the no contact order again, the university quotes from the actual knowledge analysis for its deliberate indifference argument. Counsel, you were giving the limiting principle that Judge Leah asked, and you articulated objective hostile environment, as well as facts from the university's investigation. Was there, you were about to give one another factor, I don't know if you had completed your answer to the limiting principle question. I think that there are, in terms of the hostile environment specifically, I think that the question is whether a jury could find that it was objectively reasonable that there was a hostile environment, and that a number of different facts specific considerations will come into play there, including whether there's other evidence that people agreed with it, potentially concerning the use of shared facilities. A university is different than a city of the same size, because students use the student union altogether, in a way that doesn't really happen in a city. But then there are, by the university's telling, seven other elements of a Davis claim, and all of those would have backdoor liability, and I'd like to reserve the rest of my time. We'll be giving you some rebuttal time, Judge Kirk, did you have a follow up question? No. Thank you. Thank you. I'm sorry, Mr. Brodsky, can I ask a question? Yes. I know that several other circuits have concluded that a school subjects a student to harassment by making them even invulnerable to it in an environment, even if that further harassment never really occurs. Can you make sense out of that, at least in light of a statutory language, in light of this subjected to language, I don't mind. Can you help with that? Yes, Your Honor. So a student is subjected to discrimination, if the school is deliberately indifferent to the sexual harassment because that is itself intentional sex discrimination. Davis then kind of grips on that language and saying that a student needs to be a school needs to subject its students to harassment by causing them to undergo that harassment or make them liable or vulnerable to it. That's actually an explication of the control requirement. It's sentence that comes right after the announcement of the requirement. I think the point being that whatever injury the student has to be subjected, in other words, to a further act of harassment. That's correct, Your Honor. And I'll just say a linguistic point from the university's briefing. It says that subject always means that what you're subjected to actually happens. And that's not right. So one familiar context might be from sanctioning, where we might say, for example, that Congress passed a new law that subjects polluters to a fine. That doesn't mean that all polluters have been fined. It might be true that no polluters have been fined yet. The idea is that the law makes the polluters vulnerable to a fine. And so that is the meaning of subject that then lands in the dictionary as make liable or vulnerable to and that Davis is then following. All right, we'll reserve the remainder of your time. Thank you, Ms. Brodsky. Mr. Keenan, we'll recognize you now for argument on behalf of the appellee. May it please the court, Assistant Attorney General Brian Keenan on behalf of the Board of Regents of the University of Wisconsin System. The United States Supreme Court holds that to prove a Title IX claim about sexual harassment between students, a plaintiff must demonstrate that the school was deliberately indifferent to sexual harassment, which they have actual knowledge that is so severe, pervasive and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. Mr. Rwanda's claim fails on several of those bases. That is intended to be a high bar as this court has recognized. Davis was very careful about creating a standard that wasn't going to be met in every case. And that was because it was a spending clause claim that universities are accepting this obligation based on accepting federal funds. And therefore, to be liable, they have to take an action that's like an official decision to discriminate. And that's why it's such a high bar. I thought I'd start with deliberative indifference. So, I think this case is pretty well governed by the Johnson versus Northeastern School District case on deliberate indifference. In that case, there was alleged sexual assault actually amongst, I believe they were middle schoolers or junior high kids, so they're even younger than Mr. Rwanda. They brought a claim for Title IX, but this court said that couldn't second guess the investigation that was done, which had limitations in that there are certain witnesses weren't cooperating. They were trying to deal with law enforcement, but they had declined to prosecute. Mr. King, it seems to me there's a difference between second guessing a decision and examining the school's decision-making process. Saying what a school should have done, that's for him. But examining the decision-making process is allowing the court to evaluate the reasonableness of the decision, which seems to be our task, when the standard is whether a jury could find that the university's decision here was clearly unreasonable. So, is it your position that anytime a school does anything in response to being informed about sexual assault, the school can't face Title IX indifference, deliberate indifference, liability, and why would such a rule allow schools to skirt Title IX, even when they've made the decision that they, knowing it won't protect the assault student from harm, or specifically here, even when they're fast and the record from which a reasonable jury can prove it? It's not our position that if a school does any one thing, it automatically wins a Title IX case. I think that's clear. I do believe that the standard is high, though. Mr. Arana's brief mentioned the prison medical indifference case with prison medical facility, medical professionals when they're providing care to an inmate. It's not that they do anything and that they get off the hook. However, it has to be quite a high bar to meet. It has to fall below the bare minimum standards of a qualified professional. I think deliberate indifference is a high bar. If a university takes things that are not clearly unreasonable, I think that phrasing is important from Davis, that it wasn't distinguishing this from the attacks of the dissent, which was like, this is just a reasonable standard, and say, no, it's not. It actually has to be so high that it's not clearly unreasonable. And I would say that the motive— Forgive me. Here, when she asked for a safety plan after Mr. Cephas was reinstated, basically, the university told her to call 911. They reinstated her after spending a lot of time with Mr. Cephas and his lawyer without even talking to the Title IX individual at the university or with her or her attorney. I mean, it's the ongoing consequences of any sexual assault like this that we should really be thinking about how pervasive and frightening it is to have your assailant on the very same campus. Well, I think that's inconsistent with Johnson, where the alleged rapists were in the same school with the student. Even this court recognized that they would even see each other in the hallways, which would be very painful, I would think. However, the court said that that wasn't enough to show that the— to rise to the level of deliberate indifference when the principal there had imposed a no-contact order in the case. So, in addition, I— I would put back somewhat distinguishable both of what we have in front of us. In particular, in the case that you just referenced, we had the principal engaging with the family of the victim. We also had continuous communication with the family of the victim. We had the family being aware throughout the process where the school was in the decision-making process. I guess— And as well, as you articulated, there was a no-contact order in place. Well, here what happened was Mr. Sievers was suspended. He filed a petition for reinstatement, which was publicly known. So, that's why Mr. Lana was aware of it. And the university then made a decision to reinstate him with the no-contact order continuing in place. It wasn't a new no-contact order that had always been in place. That's not what I referenced. What I mean there with the facts being distinguishable is that in the case that you referenced, we didn't have the individual in the school violating the no-contact order to the degree that a lawyer and the victim had to kind of separate the two. And so, here we have a no-contact order that we know that at least there are allegations that Sievers had violated. Yes, there's an allegation he had violated it once. I don't know that it actually is a violation of the no-contact order because it wasn't actually contact between them. However, I guess you could call it an attempted violation of the no-contact order, which what the university did was responded to him and said, you're not supposed to do that. And there was no further violation of that no-contact order. About five or six to 86, Mr. Sievers had been on the campus where they had told him repeatedly that you have violated the rules of the university. Don't do that. There was incidents in June when he first arrived on campus. There were three incidents. His first time being on campus, there was a violation of housing rules that he had walked through. So there have been several times they've told him, this is the rule, don't do that. So I don't think that we can just leave it at there was a no-contact order and there wasn't a true non-violation. So that's, I don't want us to be flipping with the facts. Well, I suppose those facts perhaps could be relevant if there wasn't a future violation of the no-contact order. And I think that's, I mean, many of these arguments kind of go together and the fact that deliberate indifference usually comes up when the school makes a decision, does something that doesn't actually result in stopping harassment and their future acts of harassment. Here, the school was made aware, took quite a bit of action, expelled Sievers, put the no-contact order in place. There was a no-contact order before the expulsion. And then there was new evidence that came forward. And I think just to explain the timing, which has been a big part of the fan's argument, Sievers' criminal trial ended on August 2nd. So it's really not a surprise that he filed his petition for reinstatement after that acquittal because he wasn't going to file it before that. He files it, the start of the school year is like September 4th. The first football game is August 30th, I believe. So they're at the same time. And frankly, Sievers has rights too in these situations in that the university can't just sit on its hands and let him not start the school year on time because of fear of Title IX liability of the lawsuit. I will say to Judge Kirsch's question, we were sued by both parties here. So I don't think that timing is suspicious at all. And I don't think it's that. The university is not disputing that he was acquitted of a different charge under a different standard than the one that he was found guilty of. There's agreement between the parties. Yes, although I don't believe that DA actually brought that lesser charge to trial. So he wasn't acquitted, but he wasn't. My point being that he was acquitted of the very charge that the university had already decided from the university's perspective, there was not evidence to charge him with a fine. That's the knowledge of sexual assault or rape with knowledge of the victim's level of intoxication. Yes. Okay. So I'm trying to understand how the acquittal changed the university's assessment of the different charge, different standard that it had decided. When you're talking about the university's evaluation in that nine-day period. Well, there's a few things. So the two different charges are, one is knowledge that someone is so intoxicated they can't consent. The lesser charge is just lack of consent. In this situation, I'm not sure how there's a difference because Ms. Urwana's testimony at the hearing, the administrative hearing was that she was so drunk that she didn't know what happened and that didn't remember anything that happened that night. So to the extent there was a lack of consent, it would have been a lack of consent based on the person being so intoxicated that they couldn't consent. So I think a second factor is that he did not speak this as would be expected, not testify at the administrative hearing when there was pending criminal charges. He did testify at the criminal trial. Another thing is that there was evidence the university did not have in the first go-round, which were video of Ms. Urwana leaving the bar when they were going to the apartment. They didn't hear Ms. Urwana's testimony because they didn't get to hear her testimony. No, but the jury heard him and the university did not have the opportunity to hear her the first time around. And a question, we're talking about a lot of other litigation that happened here. So Ms. Urwana sued the university, Mr. Cephas sued the university, Mr. Cephas was prosecuted. Do you know, did Ms. Urwana ever sue or Mr. Cephas in court? I don't believe so, but that might be a better question for my closing counsel. Counsel, let me ask you a question about a different fact. Say the university here said, you know what, we're getting sued by Bill and Paul and we're done. We are in this very high profile case going to say, we are not going to enforce our policy. If students attack each other, they attack each other, go to jail. If you're not in jail, you're welcome on UW's campus, okay? Completely deliberately different to what happened at the University of Michigan. Say after that, there's bad actors out there, you get a flood of new students in the letter. And they're all people who came to your school because they were attracted to, you're not going to enforce the policy. And then Ms. Urwana says, well, I don't want to go here to school. There's no post-notice harassment. Was she still subject to that harassment because of that decision by the university? I don't believe so. I think you need actual acts of harassment. This is pure on pure harassment. So there needs to be an act of harassment under a Davis claim. So you don't think that that fact pattern would have subjected someone to harassment? Yes. Mr. King, what about the situation that I brought up earlier, where after the new contact order, after this meeting with the school, Ms. Urwana finds out that she's in the same chemistry lab class with Mr. King. Not only that, but they were assigned to be lab. And so she's working with them, expected to work with them day to day. And so she goes back to the university and asks the university, you know what, this is happening. Can you please reassign me or reassign him to another class? And the university says, no. Let's say there's no evidence of actual an incident of harassment. Would the university's refusal to reassign either of them be actionable under Title IX? I think that may be possible. And why? Say that again from here. I think it's possible. I mean, I think what our problem is like, we're not saying that a presence of someone who has harassed you in the past. But my point is, in that scenario that I brought up, there is no actual second occurrence of harassment. There's a threat to harassment. She's vulnerable because she's lab partners with him, right? And under your articulation of the law, of the second incident element, you would say under that assessment, the university could say no because nothing has happened yet. And so the university would say, we'll only reassign you if he harasses you again. But until he does, we have no obligation. Isn't that the kind of eventual result of your rationale? No, I don't think so. I mean, part of our argument is we'll put in a no contact order, which is completely contrary to just doing nothing and having the harasser next to this person in class. So we're not saying that the presence of a harasser necessarily couldn't constitute harassment. Here, it's based on a subjective fear that this might happen in a campus that has, I think, 60,000 students. That's quite large. There's no actual presence of him. So if Ms. Arana's fear of harassment was objectively reasonable, would that be enough to trigger some sort of obligation of the university to act in the factual situation I gave you? To act when they're sharing the same lab, the kind of thing? I think that could because she's told them, this is a harassing situation for me. I'm not saying it would necessarily win, but I think schools do take action, and the university did take action here in putting no contact order in. So now, I think generally that thought there is that there will be subject with harassment. Yes, there's a much smaller schools and much smaller platforms may disagree with what you just said because they might not have the luxury of moving students from one classroom to the next. Well, that is true. They may have to say no contact order is it, and we're not deliberately indifferent, and we're not subjecting the student to further acts of harassment by putting them in the same classroom. I would be willing to bet here, this case is made somewhat easier, but I bet Cephas didn't even go to class when he was free at State, okay? This is a little easier than a typical situation where I bet he wasn't even on campus, except for the football field, back and forth to his apartment and back and forth to the facility. I mean, he did drop out after the semester ended. Surprise, surprise. That would be NFL, right?  Keenan, can you clarify, please, your response to Judge Lee's question? Is your response that the university could potentially be liable because putting her in class and making her be the lab partner with Cephas alone is an act of harassment, or that that makes her vulnerable to harassment to have to work with her former harasser? No, I think it's the, you place this person in this situation to be working so closely together that that could be an act of harassment. I do, to Judge Kirsch's point, I mean, in Johnson, they do talk about how the accused has rights as well, and there's issues with schedules and whether you can actually move someone to a different class. So that's not automatic that you can be liable or you're required to do that. I took the question to be like, could that possibly be an act of harassment? I think a lab partner situation, I think that could be because you're placing this person directly in close contact with someone who she thinks is, she's accused of sexual assault. And I'm wondering what the, you know, because as an appellate court, our rule is trying to articulate a broad rules and principles, right? They're applicable to different fact situations. What would be your rule that would distinguish that case from what you'd say we have here, which is for a case where there's no further contact and the alleged perpetrator has left campus and all we have is subjective fear. So what distinguishes those two scenarios? I think there's like a couple of things that are distinguishing that. One is that they've been put in close contact, but the victim has approached the university and said, this is harassing me. And so the university has knowledge of that specific, you know, like harassing situation. And if they fail to act there, that's like generally what Davis talks about is like that you have notice of harassment. Now, maybe it isn't harassed, you know, like, I mean, but like potentially that is, and they have special notice of this. And then I think you depend like, well, what, I mean, kind of on the deliberative difference piece of that, like what are the options in terms of like, what can they do to like remedy that situation? I think at the university of Wisconsin, it's not very difficult to like put people in different classes. And that happened here with the other, the other player, Mr. Davis, who wasn't the same class and they were able to like switch classes. A smaller school, perhaps maybe there's, there's different considerations there for small schools that don't have the ability to like just have thousands, you know, many different classes going on. Are we able to shift here? I know another factor that we have to consider for purposes of Davis is context and context being under the school's control. And on the university's website for undergraduate housing, one of the options for students who want to go to campus is what we call the campus off-campus housing services on the university's website. And it directs students there. If you want to live off campus, this is the marketplace to do it. And Humbucker apartments is one of the ways that the university funding is heading provides, as well as the rates if you stay at Humbucker apartments. Is that enough to demonstrate? I don't believe so. That seems like a website that lists potential housing options for students, but the university doesn't actually control the premises. I don't see how that would be sufficient to have control over the context of that, that incident of harassment. Mr. King, doesn't the university's disciplinary policy that apply to this event expressly reach off-campus incidents between students like this one? Yes, that's true. Because there's two factors of which the university has to have control of, which is control of the harasser and control of the context. So we think that, you know, it shows control over the harasser. We don't believe it shows control over the context of the harassment. I think that was the mistake that the Brown case from the ninth circuit. Well, both of them, I mean, they're both subject to the student code of conduct, which prohibits sexual assault. And the university had control. Over what took place on campus. After the assault. Yes, that's true. We don't. Sorry.  I could answer what I, so. We don't dispute that the university has control over what happens on campus and what happened, like once they had knowledge, they could do certain things on campus. I think the point is that the first incident, like the control over the context is supposed to be that. The university could do something about harassing to stop. We don't think that's the case with like off-campus housing. You know, where it's not actually owned by the university or not. I don't think that's the case. That assumes the focus is on the initial. Which does not seem to be. Okay. Isn't our focus here. We've been discussing. Whether the university adequately protected, Mr. On campus. Further harassing on campus. After she disclosed for us. That possible environment. Here. Completely unreasonable. Reasonable response. So it seems to me that. This discussion. Residence is not. Well, From my perspective that there wasn't further harassment after that incident. In the context of the university controls, all you're left with is this fire incident. That's grassman in a context university did not control. But isn't it the ongoing consequences of the. Of the sexual assault that we should be zeroing in on. And the universities. I'm going to repeat. They told her 911. Call 911. Yes. Well, I would say that. Well, one, I think. There is a case in the circuit saying there's no safety plan that personalized formal safety plan that needs to be implemented. I think second, this happened in a meeting between. The head of security of on campus. And Mr. Rana and her attorney, and I believe an assistant dean. For campus life. Which to me, the university personally meeting with Mr. Rana with these high-level officials show us exactly the opposite of deliberate indifference where you're just like, whatever. That harassment is going on. We don't care. I think. Mr. Rana often cites the Fairfax County case where the, you know, the officials there were like laughing and making jokes about an assault that had occurred. On a school field trip. This is the exact opposite of that. I think they just didn't, they didn't think she had specific fears. It was a generalized fear that she might run into CFS on campus. And I don't know that there's much that security can do about a generalized subjective fear that someone on a very large campus. You might run into this person accidentally. Council that. Context is limited to what happened. On campus. After the admission. In regards to context. Like the context of the harassment. Yes. We think that. For the university to be liable, it has to be some place where the university has control over the context of the harassment, which. In this case, it was really on campus. There are instances where perhaps off campus behavior is like this Fairfax. As I mentioned, it was a school field trip. There's a school bus. There's students on it. You know, teachers and chaperones on the bus that. I don't know.  Control over the context. But here, I don't know that there was any allocation of something that happened. That wasn't on that. Once it's been on campus, I guess. There just really wasn't actually an incident of. Mr. Sebas doing anything further. Respective of what occurred at the apartments. Simply one. In the context of this case. Yes. I think so. I don't think that's true. The plaintiffs and there's some. There's cross motion for summary judgment here. So there's like, it's like six briefs. And then there's a summary judgment motion. Which I find to be a little bit. Sort of like. So both parties move at the same time, then response replies. And the plaintiffs. There are some retirement motion on their behalf said that the university had control of the context of that. So they developed the actual. So, let me ask you some facts. There's a football player. When he woke up. Did they control when he woke up? I guess I could put a. Regulate. The team could ever rule. I don't know if they can actually control. I think they have a lot. I just don't know. I don't know. I don't know. Make the troll. Termination. And the difference between controlling the harasser. Yeah, I think that's like. They don't control the restaurants. They don't control. The hotels, they don't control the gas stations. Yeah. It's simple. I didn't see it in the record, but did it cover. I believe it did. Yeah. And so in some ways, there's control. The university did have. Or thought it had control. Perhaps. And so. This control analysis. Together. Does it not. Well, I think they have to be. I think there's two different, I guess. Analysis is one is what the university just decides to do for its discipline. And second, what's actually the law under Davis as to what the constitute action goals, sexual harassment under title nine. And so the university can try to go past that, you know, and say, you know,   trying to regulate behavior that it's not actually. Maybe wouldn't be liable for. Under title nine, but still wants to. Let's see if it's know that you shouldn't be contacting. So I think those are two different, two different questions. That I think it's often, you know, people take steps that go above and beyond the legal, the legal standard in terms of imposing discipline. Let me ask you one. We talked about. We're at farm. Suppose a student knows that. Response to her attack. So she takes matters into her own. And, you know, changes her course schedule.      If all spends is the least amount of time on campus as possible. How do we take on how your position? Should we take the students self preservation actions? Into account in our title nine deliberative defense. Action. Is the university's position that the old way. I don't mind viability. It was fooled as if the student allows herself to be attacked again. Versus taking matters into their own hands. Um, well, we do think there needs to be some further active harassment. It wouldn't necessarily have to be an attack. Um, it would just have to be harassment. I think that. Uh, That's something that's been saying. But, um, could you repeat your question? How do we take into account the student self preservation action? Okay. No.  But I do think that I haven't seen any. I see my red slides. Where the students subjective. Speculation that the school will not enforce any of its discipline. Would sustain a title nine playing based on. You know, like, just thinking that it's not going to, that the school is not going to do anything. Um, the sport, like in Johnson has a pal. You know, when there's, you know, No contact orders. Thank you. Ms. Brodsky, we'll give you 10 minutes for rebuttal. I'd like to start you out with. The case that is. The large grill in the room. We haven't talked that much about that. And this is the 1st case cited in Davis. And there. The school's deliberate indifference to post notice acts of harassment. Make it subject to title. Nine liability. It's got to be clear. Whether the university had noticed. That it could be liable for its conduct. Otherwise. Please give us the benefit of your thoughts because Penrose does. It's the foundation upon which all of this cause of action. Absolutely. So after Penhurst. Bennett from the Supreme court Parker from this court, Jackson from the Supreme court. Say that. While a statute needs to give. A regulated entity notice of what liable for, it doesn't require the level of granularity that would be required. And it doesn't require the level of clarity that would be required. So let's say qualified. That is. A clear state. It's called. It's got to indicate, but this is the kind of claim. Because of the contractual relationship that exists between. The recipient. And the. Individual seeking a recompense. Given that there's got to be some clarity. If it is unclear. I'm not sure what the cause of action is. I'm not sure how there can be notes. Sure. So 2 points there. Your honor. The 1st is that I would point to support for Jackson and Parker. That specifically formulate. What has specific notice. The statute needs to provide in the title 9 context, which is that. Both of those cases say that title 9 tells schools that they will be liable for intentional sex discrimination. So if what they are doing is intentional sex discrimination. If it's not intentional sex discrimination. They had specific notice. And that's why, for example, in Davis, where there was a split. For Davis. Let's not slide that between the pre notice and post slide. Because the university did not know about sexual assault. You know, it's only what they knew after. You're you're brief on the base, pretty clear on page 22. You're not talking about a pre notice. You're not talking about a pre notice. You're talking about a post. That's right. Your honor. But I think notice functions differently. So there's 1 question, which is the schools. Notice vis-a-vis it's a contract with the federal government. That did it have noticed that it wouldn't, it said, yes, we will take federal funds. That it could be subject to money damages for a certain set of actions and the level of granularity you need. I think there's a separate question about whether the school has actual knowledge of harassment. That's distinct from the spending cost statute. And the reason that gets her adopted that had to do with the. Express the mechanics of the express administrative. Resolution with the department of education that requires opportunities for voluntary resolution. So I think those are separate kinds of notice. Is this opening the door to any type of sexual assault? Amen. It just strikes me. There is no limiting principle. If the notice that's defined. For title nine. For the type of claim allows claim. Any type of sexual harassment. Then. Pre notice post notice. The university would always be liable. It's sued both ways. So tell me your honor. I'm sorry. I'm not being responsive to your question. But I think that the question of whether the school had notice of what it was signing up for, right? Taking money from the government is different than the question of whether it was actual knowledge of sexual harassment. And so it's absolutely true. This clear from CS that a school will not be liable, even if it's response is clearly unreasonable, even if it should have known about the harassment. If it does not have actual knowledge of harassment that has actually occur. And so that actual knowledge requirement isn't going anywhere. While we have cases like. Jackson Parker hall from the third circuit. I'd point you toward judge. Now she's concurrence. Maybe we shouldn't. There's a case from the second circuit that explained that. In a case like this, the school has the knowledge. It needs for spending. That would be liable. If I can just make three points in response to schools arguments. So the first is I'm delighted what we agree on. So it sounds like the parties agree that the presence of a harasser can be itself harassing per log book for the university's own findings. And also that that presence. Can satisfy a further harassment requirement. If one exists. Second thing judge prior, I just wanted to offer one more factor that might be relevant to the question of whether a victim's experience of a hospital environment is objectively reasonable. And that's the severity of the violence. So in this instance, we have. Isabel had seen see this twice before in her life. The first time he repeatedly raped her. The second time he tried to make physical contact with her. So her fear was that if she saw him again. That she would do something bad to her again. And that then distinguishes a case where there might be lower level harassment, where a victim might still fear. Seeing their harassment, their harasser, but a jury might think that that's not as objectively reasonable. I also just wanted to say something about forfeiture of the all campus. Issue. So. University points to the fact that there was, there were cross motions. But that's not a substitute either formally or practically. For the, for Isabel's opportunity to brief below the question of whether the school is entitled to summary judgment on that. So this board has already acknowledged that briefing on whether one party is entitled to summary judgment on an issue. Isn't the same as briefing on whether another party is entitled. Because in one context through the plaintiff, you're trying to prove there is a dispute of fact. And the other you're trying to prove there's no dispute of that. And the way that that played out for Isabel here was that when she moved affirmatively for summary judgment. She focused on the who's to solve on campus hospital environment in the university control over that context, which made sense because there's no dispute of fact over whether a university had control over that context. There was just a legal question about whether that's the right context to focus on. That's a great summary judgment strategy. I wasn't part of the team. So I can say that when we're talking though, about whether the university is entitled to summary judgment on this  then it makes sense for Isabel to talk about control over the context of the rates themselves, because there's a dispute of fact on that. No one's entitled to summary judgment on that basis, but because the university didn't properly raise this below, she didn't have the opportunity to develop the evidence, including information about the nature of this apartment. And it's the nature of its relationship to the school that we know, but we didn't have an opportunity to put into the record. I'd also like to offer potentially a distinction for the court to keep in mind in terms of where reasoning school's reasoning to its analysis. So I think Davis is very clear that a school is not going to be liable just because it gets the answer wrong. And so this court is not reviewing a school's findings or reasonings as though they were the findings of an ALJ on appeal to federal. But that doesn't mean that the reasoning is in a black box that this court can't touch, even if that reasoning or lack thereof is probative of part of one of the parties claims. In this instance, the reasoning, the decision-making is probative of the later decision being pretextual and instead motivated by the university's own junior and reputational interests. The school relies heavily on the fact that it was concerned about litigation from both sides, but Ritchie versus Stefano tells us that being concerned about a lawsuit from one person or group of people is not an excuse to discriminate against the other. Ms. Bratzky, on the topic of all the lawsuits, could you answer the question that I had, Mr. Keenan? Was there also litigation that Ms. Arana brought into court against students directly to recover from the assault? No, Your Honor. And also in terms of the other lawsuits, so you're right, Your Honor, that the charge that CFIS faced criminally was distinct, not only in terms of the standard of evidence, but also in terms of the actual elements of the claim. A juror actually went to the press afterwards and said that the element that they had been convinced by to acquit was the distinction between what the school found him responsible for. That is, the juror said, we didn't think that there was enough evidence that he knew that the women were too incapacitated to defend. The school agreed with that in their initial hearing, in saying that he wasn't responsible for second degree sexual assault, only third. And I think that the Cypress-Fairbanks case from the Fifth Circuit is very helpful on the point of how parallel criminal proceedings might come in. So there the court said that it might be reasonable for a school to rely on law enforcement investigative expertise, but it would be clearly unreasonable for the school to rely on a prosecutor's decision not to bring charges because again, different elements, different standards of evidence doesn't mean that a violation of the student conduct can occur. And I think that that also is representative of that case demonstrates the ways that a school's reasoning can come into play. So just like the Sixth Circuit in Weimar, the Fifth Circuit in Cypress-Fairbanks said whether the school's decision to dismiss this complaint is fairly unreasonable or not, it depends on why they did it. And I think that that has to be true based on two uncontroversial principles from the case law. The first is that if a school receives a report of sexual harassment and does nothing with it, that's going to be deliberately indifferent. If a school receives a report of sexual harassment, investigates, tries to get it right, unfortunately just misjudges the evidence, that's not going to be evidence of deliberate indifference. In both fact patterns, you have no sanction. What that tells us is that how the school gets to its final result, why it gets there, that is relevant to deliberate indifference analysis. Thank you, Ms. Brodsky. Thank you, Ms. Chiquita. In the case we take on our advisement, the court will stand in recess. Thank you. All rise. Thank you.